# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **RONALD ROBERT GLADDEN,** : | |
|     **Petitioner** : | |
| : | No. 1:21-cv-00802 |
| v. : | |
| : | (Judge Kane) |
| **WARDEN CLAIR DOLL,** : | |
|     **Respondent** : | |

## MEMORANDUM

On May 3, 2021, pro se Petitioner Ronald Robert Gladden ("Petitioner"), who is currently confined at the York County Prison ("YCP") in York, Pennsylvania, initiated the above-captioned action pursuant to 28 U.S.C. § 2241, challenging the constitutionality of his detention by the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"). (Doc. No. 1.) Petitioner asserts that he is entitled to relief because of the COVID-19 pandemic. (Id.) Petitioner also seeks the release of his medical records. (Id.; Doc. No. 4.) Following an Order to show cause (Doc. No. 9), Respondent filed a response, contending that Petitioner's detention is lawful (Doc. No. 12). Upon review of Petitioner's filings and Respondent's response, the Court concludes that it is unnecessary to wait for Petitioner's traverse before ruling upon his petition. For the following reasons, the Court will deny Petitioner's § 2241 petition.

## I. BACKGROUND

### A. Facts Regarding Petitioner

Petitioner is a native and citizen of Belize who was admitted to the United States in 1983, at or near Los Angeles, California, as a non-immigration visa B1 visitor. (Doc. No. 12-1 at 4.) Petitioner was authorized to remain in the United States until September 1983, but he continued to remain beyond that date. (Id.) On October 16, 2017, Petitioner was convicted of

manufacture, delivery, or possession with intent to manufacture or deliver methamphetamine and conspiracy to do the same in the Court of Common Pleas for Philadelphia County, Pennsylvania. (Id.)  He was sentenced to three (3) to six (6) years' imprisonment for each offense. (Id. at 17.) On March 23, 2018, ICE lodged a detainer against Petitioner while he was serving his sentence at the State Correctional Institution in Camp Hill, Pennsylvania ("SCI Camp Hill"). (Id. at 10.)

On March 25, 2019, Petitioner was placed into removal proceedings after ICE issued a notice to appear, charging Petitioner with being removable pursuant to section 237(a)(1)(B) of the Immigration and Nationality Act ("INA"), based on Petitioner's exceeding the time period during which he was authorized to remain in the United States, and pursuant to section 237(a)(2)(A)(iii), based on Petitioner's conviction for an aggravated felony relating to trafficking a controlled substance and his conviction for conspiracy. (Id. at 3, 9.)  On April 15, 2019, Petitioner was served by mail with a Notice of Intent to Issue a Final Administrative Removal Order ("FARO"). (Id. at 13-14.)  The FARO became final on July 23, 2019, and Petitioner was ordered removed to Belize. (Id. at 16.)  Petitioner was released to ICE custody on April 21, 2021. (Id. at 17.)

On May 18, 2021, DHS reviewed Petitioner's custody pursuant to Fraihat v. ICE, 445 F. Supp. 3d (C.D. Cal. 2020).[1]  (Doc. No. 12-1 at 17-19.)  DHS noted that Petitioner was aged 55 or older and suffered from the following conditions: hypertension, high blood pressure, diabetes, and diverticulitis. (Id. at 19.)  Although DHS noted that Petitioner's conditions placed him at heightened risk of contracting COVID-19, it decided that he should remain detained because he

---

[1] The Fraihat court issued a nationwide injunction directing ICE to identify and track all detainees with conditions placing them at heightened risk of contracting COVID-19. See Fraihat, 445 F. Supp. 3d at 751.  The court also directed ICE to "make timely custody determinations for detainees with [such] [r]isk [f]actors."  See id.

posed a threat to public safety given his previous drug trafficking convictions as well as a prior conviction for driving under the influence. (Id. at 17-19.) On June 2, 2021, an immigration judge conducted a reasonable fear determination and concluded that Petitioner had not established a reasonable fear of persecution or torture should he be removed to Belize. (Id. at 20.) This is a final order and no administrative appeal is available to Petitioner pursuant to 8 C.F.R. § 1208.31(g)(1). (Id.)

### B. Facts Regarding YCP's Response to COVID-19

Since the onset of COVID-19, "ICE epidemiologists have been tracking the outbreak, regularly updating infection prevention and control protocols, and issuing guidance to field staff on screening and management of potential exposure among detainees." (Resp. Ex. 10, Ritchey Decl. ¶ 8.) YCP is following guidance set forth by the Centers for Disease Control ("CDC") "to safeguard those in its custody and care." (Id. ¶ 9.) Moreover, on April 10, 2020, "ICE ERO released its COVID-19 Pandemic Response Requirements (PRR), a guidance document that builds upon previously issued guidance and sets forth specific mandatory requirements expected to be adopted by all detention facilities housing ICE detainees." (Id. ¶ 10.) The PRR also sets forth "best practices for such facilities." (Id.)

ICE has reviewed its detained population of at risk inmates to "determine if detention remains appropriate, considering the detainee's health, public safety, and mandatory detention requirements, and adjusted custody conditions, when appropriate, to protect the health, safety, and well-being of its detainees." (Id. ¶ 27.) YCP "has the capacity to house 2,245 inmates and has historically often operated near capacity." (Id. ¶ 7.) As of May 19, 2021, however, "there [were] only 1,350 combined male and female inmates and detainees housed at the facility." (Id.)

YCP screens all detainees for COVID-19. (Id. ¶¶ 11-12.) During intake medical screenings, detainees are assessed for fever and symptoms of respiratory illness and asked to confirm whether they have had close contact with a person with a confirmed COVID-19 infection or "traveled from or through area(s) with sustained community transmission in the past two weeks." (Id. ¶ 13.) "The detainee's responses and the results of these assessments will dictate whether to monitor or isolate the detainee." (Id. ¶ 14.) All intakes are screened with temperature checks, a questionnaire, and antibody testing, with or without a nasal swab. (Id. ¶¶ 12-13.) All staff and vendors are also screened when they enter the facility. (Id. ¶ 20.) Automatic electronic temperature screening devices have been installed at employee entrances. (Id.) Moreover, YCP has limited professional visits to non-contact visits and has suspended in-person social visitation and facility tours. (Id. ¶ 21.) Detainees may meet with their attorneys via video or telephone. (Id.)

Detainees have daily access to sick call and 24/7 access to the onsite medical staff. (Id. ¶ 18.) "After hours, there is always a provider on call to answer questions and manage medical issues." (Id.) Per ICE policy, YCP has designated units to be used for routine quarantining of asymptomatic intakes and transfers. (Id. ¶ 15.) These units accept detainees until they are closed, and the 14-day quarantine clock starts when the last detainee is admitted. (Id. ¶ 15.) If a detainee in a unit develops symptoms during quarantine, that detainee is moved to isolation and the 14-day period starts anew. (Id.) Symptom and temperature checks are performed daily, and a random unit within YCP is chosen for COVID-19 screening every day. (Id.) Before a unit is opened to the general population, everyone is screened with symptom and temperature checks. (Id.) Medical staff also conduct roving temperature checks throughout the facility. (Id. ¶ 25.)

Detainees who test positive are isolated and treated and transported to the hospital if their condition deteriorates. (Id. ¶¶ 14, 23.) YCP has negative pressure single isolation rooms, as well as an old gym and work release center, that can be used for isolation housing. (Id. ¶ 23.) Isolated detainees are assessed twice daily. (Id.)

Asymptomatic detainees who have been exposed to someone with COVID-19 are placed in quarantine with restricted movement for a minimum of 14 days, but in most cases 21 days. (Id. ¶ 16.) They are monitored daily for fever and respiratory illness. (Id.) Those that show fever or respiratory illness are referred to a medical provider for evaluation. (Id.) Quarantining is discontinued when the minimum 14-day period is complete with no new cases. (Id.) Although cells and units for administrative or disciplinary segregation may be used for quarantine and isolation, detainees are still provided access to TV, reading materials, recreation, and telephones to the fullest extent possible. (Id. ¶ 17.)

YCP has increased the frequency of sanitation protocols, the availability of sanitation supplies in the housing units, and repeatedly cleans high-traffic areas throughout the day. (Id. ¶ 19.) Soap, water, and hard surface disinfectant are available in all housing units. (Id.) Each detainee receives a bar of soap and immediately receives a replacement once it is gone. (Id.) Detainees have access to 670 bathroom sinks and areas for handwashing and hygiene. (Id.) There are forty-seven (47) hand sanitizer stations present throughout YCP for staff to use. (Id.) Alcohol-based hand sanitizer is also available for staff to use. (Id.) Hand sanitizer is not provided to detainees for security reasons, but they do receive a travel-sized packet of hand sanitizer to take with them upon release. (Id.) Telephones in all common areas are cleaned after each use. (Id.) Detainees may ask for cleaning supplies at any time. (Id.)

All staff or personnel entering YCP must wear a surgical-style mask; they are required to wear N-95 masks if they are dealing with symptomatic detainees or those who have tested positive for COVID and if they are conducting outside transports. (Id. ¶ 25.) As of September 2, 2020, all staff and personnel entering YCP must wear N-95 masks as well as safety glasses. (Id.) Employees have also been provided face shields as alternatives to safety glasses. (Id.) On April 7-8, 2020, YCP distributed surgical masks to all detainees and inmates, along with directions for proper use. (Id.) YCP has also arranged to launder masks and provide a second mask to each person in custody. (Id.) Detainees may remove their masks to eat, drink, and shower. (Id.) Those confined to cells must wear the masks anytime they are out of the cell. (Id.) Detainees in dormitory settings must wear their masks when not sleeping, but mask-wearing while sleeping is encouraged. (Id.) Isolated detainees must wear N-95 masks when they leave their unit. (Id.) Detainees are encouraged to war their masks at all times and can receive disciplinary reports if they are consistently non-compliant. (Id.)

YCP has test kits available, and all new intakes are tested for COVID-19 antibodies. (Id. ¶ 12.) If new intakes test negative for COVID-19 antibodies they are given nasal swab tests. (Id.) YCP also routinely performs COVID-19 tests in the absence of clinical suspicion. (Id.) YCP offers voluntary nasal swab testing to staff members. (Id. ¶ 20.) Staff members also have access to a commercial lab center open to the public. (Id.)

On May 10, 2021, all ICE detainees were offered the Johnson & Johnson COVID-19 vaccine through PrimeCare, YCP's medical provider. (Id. ¶ 31.) On that date, "anyone who appeared at the vaccination site set up in a gym was vaccinated." (Id.) On that date, approximately 25% of the detainee population—approximately 108 individuals—were vaccinated. (Id.) Approximately 70 individuals were not eligible because they had been

6

diagnosed with COVID-19 within the last 90 days. (Id.) Approximately 259 individuals declined the vaccine. (Id.) YCP is planning additional distribution of the vaccine, which must "be distributed in groups of no less than five at a time." (Id. ¶ 32.) Any detainee who wishes to be vaccinated can submit a sick call slip. (Id.) "Once PrimeCare has met distribution protocols and it is determined the detainee qualifies to receive the vaccine, PrimeCare will arrange for the detainee to receive the vaccine." (Id.)

As of May 19, 2021, there have been 350 confirmed cases of COVID-19 at YCP since March of 2020. (Id. ¶ 24.) As of the morning of May 19, 2021, there were 35 ICE detainees who had tested positive for COVID-19 who were being housed in isolation under medical observation. (Id.) Additionally, there have been 768 confirmed cases among county inmates; "759 of these inmates have been cleared and are no longer subject to isolation/quarantine requirements." (Id.)

### C. Petitioner's § 2241 Petition

Petitioner filed the instant § 2241 petition on May 3, 2021. (Doc. No. 1.) Petitioner avers that his Eighth and Ninth Amendment rights have been violated and that staff at YCP have failed to provide him copies of his medical records. (Id. at 1-2.) Petitioner requests release of such records, a review pursuant to Fraihat, and $1,000.00 per day that he is incarcerated at YCP. (Id. at 1-5.) Petitioner has also filed a motion to compel seeking release of his medical records. (Doc. No. 4.)

## II. LEGAL STANDARD

Under 28 U.S.C. § 2241(c), a prisoner or detainee may receive habeas relief only if he "is in custody in violation of the Constitution or laws or treaties of the United States." See 28 U.S.C. § 2241(c)(3); see also Maleng v. Cook, 490 U.S. 488, 490 (1989). Because Petitioner is

currently detained within the jurisdiction of this Court and asserts that his continued detention violates due process, this Court has jurisdiction over his § 2241 petition. See Zadvydas v. Davis, 533 U.S. 678, 699 (2001); Spencer v. Kemna, 523 U.S. 1, 7 (1998).

## III. DISCUSSION

Respondent asserts that Petitioner's § 2241 petition should be denied because: (1) his claim requesting medical records is not cognizable in a habeas action; (2) he has already received a Fraihat review; and (3) his conditions of confinement do not violate the Constitution. (Doc. No. 12 at 32-33.) The Court considers these arguments below.

### A. Non-Cognizable Claims

Plaintiff seeks the release of his medical records "to reveal his claims." (Doc. No. 1 at 5.) Plaintiff has also filed a motion to compel the release of such records. (Doc. No. 4.) Plaintiff also seeks $1,000.00 per day that he is incarcerated at YCP. (Doc. No. 1 at 5.) Plaintiff, however, cannot seek such relief in a habeas action. As the United States Court of Appeals for the Third Circuit has explained:

> When read together, there is a logical and coherent progression of Supreme Court jurisprudence clarifying when § 1983 [or Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971),] is unavailable: whenever the challenge ultimately attacks the "core of habeas"—the validity of the continued conviction or the fact or length of the sentence—a challenge, however, denominated and regardless of the relief sought, must be brought by way of a habeas corpus petition. Conversely, when the challenge is to a condition of confinement such that a finding in plaintiff's favor would not alter his sentence or undo his conviction, an action under § 1983 [or Bivens] is appropriate.

Leamer v. Fauver, 288 F.3d 532, 542 (3d Cir. 2002). Money damages are not available in a habeas action. See Ruff v. Warden FCI Schuylkill, No. 1:20-cv-851, 2020 WL 2839092, at *1 n.2 (M.D. Pa. June 1, 2020) (citing Preiser v. Rodriguez, 411 U.S. 475, 494 (1973)). Likewise, Petitioner's claims seeking his medical records are not cognizable in a habeas action. See Lee v.

8

Williamson, 297 F. App'x 147, 148 (3d Cir. 2008). Accordingly, Plaintiff's claims seeking release of his medical records and monetary damages will be dismissed, and his motion to compel will be denied.

### B. Petitioner's Request for a Fraihat Review

Petitioner also appears to seek a custody review pursuant to Fraihat. As noted supra, however, Petitioner received a custody determination pursuant to Fraihat on May 18, 2021, after initiating the above-captioned action. (Doc. No. 12-1 at 17-19.) Accordingly, because Petitioner has already received a Fraihat review, his § 2241 petition will be denied as moot to the extent he seeks such relief.

### C. COVID-19 Claims

A civil immigration detainee is entitled to the same due process protections as a pretrial detainee under the Fifth Amendment. See Hope v. Warden York Cty. Prison, 972 F.3d 310, 325 (3d Cir. 2020) (citing E.D. v. Sharkey, 928 F.3d 299, 306-07 (3d Cir. 2019)). Habeas corpus cases in which an immigration detainee alleges a violation of his Fifth Amendment rights arising from COVID-19 "are generally based on two 'separate but related theories': first, that the petitioner's risk of exposure to COVID-19 amounts to punishment, and second, that the detention facility's COVID-19 policies amount to deliberate indifference to a serious medical need." See Dannu v. ICE, No. 1:20-cv-1491, 2021 WL 916191, at *2 (M.D. Pa. Mar. 10, 2021). Under either theory, a court should consider:

> (1) whether the petitioner has been diagnosed with COVID-19 or is experiencing symptoms consistent with the disease; (2) whether the petitioner is among the group of individuals that is at higher risk of contracting COVID-19; (3) whether the petitioner has been directly exposed to COVID-19; (4) the physical space in which the petitioner is detained, and how that physical space affects his risk of contracting COVID-19; (5) the efforts that the prison has made to prevent or mitigate the harm caused by COVID-19; and (6) any other relevant factors.

See Saillant v. Hoover, 454 F. Supp. 3d 465, 471 (M.D. Pa. 2020). "It is not enough for a petitioner to allege that he is detained and presented with a risk of contracting COVID-19 that is common to all prisoners. Rather, the petitioner must make an individualized showing that he is entitled to habeas corpus relief when considering the above factors." Id. (citing Verma v. Doll, No. 4:20-cv-14, 2020 WL 1814149, at *5-7 (M.D. Pa. Apr. 9, 2020)).

### 1. Conditions of Confinement

With respect to Petitioner's claim that conditions at YCP violate the Constitution, he must demonstrate that his conditions of confinement "amount to punishment of the detainee." See Bell v. Wolfish, 441 U.S. 520, 535 (1979). "To determine whether challenged conditions of confinement amount to punishment, [a court must] determine[] whether a condition of confinement is reasonably related to a legitimate governmental objective." Sharkey, 928 F.3d at 307 (quoting Hubbard v. Taylor, 538 F.3d 229, 232 (3d Cir. 2008)). If it is not, the Court "may infer that the purpose of the governmental action is [unconstitutional] punishment." See id. The Third Circuit "further instructs that [courts must] consider the totality of the circumstances of confinement, including any genuine privations or hardship over an extended period of time, and whether conditions are (1) rationally related to their legitimate purpose or (2) excessive in relation to that purpose." See Hope, 972 F.3d at 326.

When assessing whether a governmental interest is legitimate, the Supreme Court has not "detail[ed] the precise extent of the legitimate governmental interests that may justify conditions or restrictions of pretrial detention." See Bell, 441 U.S. at 540. However, the Supreme Court has recognized that ensuring detainees' presence at hearings, along with "the effective management of the detention facility once the individual is confined," constitute legitimate governmental interests. See id. Moreover, the Government has a legitimate interest in

"protecting the public from harm," see Hope, 972 F.3d at 326, and "in reducing the flight risk posed by prisoners facing removal." See Builes v. Warden Moshannon Valley Corr. Ctr., 712 F. App'x 132, 134 (3d Cir. 2017).

Upon review of the record, the Court concludes that the current conditions at YCP do not amount to unconstitutional punishment. The Court recognizes that "[p]risons present unique concerns regarding the spread of this virus; by their very nature, prisons are confined spaces unsuited for 'social distancing.'" See Verma, 2020 WL 1814149, at *4. However, "CDC guidelines specifically contemplate that individuals will be confined within prisons during the duration of this pandemic." See Evdokimow v. Doll, No. 4:21-cv-261, 2021 WL 767554, at *6 (M.D. Pa. Feb. 26, 2021). Conditions at YCP no longer resemble the "unsanitary, tightly-packed environments" that led a different Judge in this district to order the release of ICE detainees last year. See Thakker v. Doll, 451 F. Supp. 3d 358, 370 (M.D. Pa. 2020).

First, YCP has removed many detainees and, as of May 19, 2021, was operating well under capacity. As this Court previously noted with respect to conditions at YCP:

> YCP has taken significant measures to sanitize the environment, as well as prevent the introduction or spread of COVID-19. . . . [A]ll new intakes are tested for COVID-19 antibodies, and any who do not test positive for such antibodies are provided a swab test. Moreover, medical intake screenings assess detainees for fever and respiratory illness and whether they have had close contact with infected individuals. If a detainee tests positive, he or she is placed in isolation. If a detainee is exposed to a person who has COVID-19, asymptomatic detainees are placed in quarantine and are monitored daily for symptoms. Medical staff also conduct roving temperature checks throughout the facility.
>
> YCP provides soap, water, and disinfectant to inmates. Hand sanitizer is available to staff, and high-traffic areas are cleaned and disinfected repeatedly throughout the day. Telephones are cleaned after each use. All inmates have been provided with surgical masks, and all staff members must wear an N95 mask. YCP has also limited professional visits to non-contact visits and has suspended in-person visitation and facility tours. Detainees may still meet with their attorneys via telephone or video non-contact visits.

11

See Baghdad v. Doll, No. 1:21-cv-293, 2021 WL 1391784, at *8 (M.D. Pa. Apr. 13, 2021). Upon review of the record, the Court concludes that Petitioner's conditions of confinement are not unconstitutionally overcrowded or unsanitary. Instead, YCP's response has been effective at curbing the introduction or spread of COVID-19. Since March of 2020, there have been 250 cases of COVID-19 among ICE detainees; however, as of May 19, 2021, there were 35 detainees who were positive for COVID-19 and housed in isolation. Another Judge of this district has emphasized the "drastic changes put into effect at [YCP]," concluding that the improved conditions there did "not negate the Government's legitimate interest in detention." See Thakker, 456 F. Supp. 3d at 657. Likewise, in Hope, the Third Circuit analyzed conditions that, "at the time, were similar to the conditions as they exist today, although arguably less safe because the facility did not have the ability to test all new incoming detainees." See Evdokimow, 2021 WL 767554, at *8 (citing Hope, 972 F.3d at 327-28). Nevertheless, the Third Circuit concluded that the petitioners had not demonstrated likelihood of success on their claim that the conditions of confinement amounted to unconstitutional punishment. See Hope, 972 F.3d at 329.

In sum, the Court concludes that the record reflects that detainees at YCP receive adequate protection from COVID-19. Petitioner's detention is reasonably related to several legitimate governmental interests, and his conditions of confinement do not amount to punishment that violates the Constitution. Accordingly, Petitioner's claim regarding his conditions of confinement will be denied.

### 2. Deliberate Indifference

Petitioner also appears to be asserting a claim that YCP has demonstrated deliberate indifference to his medical needs. With respect to allegations of inadequate medical care, prison

officials violate the Fifth Amendment "when they exhibit deliberate indifference to serious medical needs of prisoners." See Woloszyn v. Cty. of Lawrence, 396 F.3d 314, 320 (3d Cir. 2005). "The detainee's condition must be such that a failure to treat can be expected to lead to substantial and unnecessary suffering, injury, or death." Id. However, "there can be no reckless or deliberate indifference to that risk unless there is something more culpable on the part of the officials than a negligence failure to recognize [such] high risk." See id. "[T]he risk of . . . injury must not only be great, but also sufficiently apparent that a lay custodian's failure to appreciate it evidence an absence of any concern for the welfare of his or her charges." Id.

Petitioner appears to suggest that the only way to protect vulnerable individuals, such as himself, from seriously adverse health conditions is to prevent them from being infected by releasing them from custody. However, "a failure to eliminate all risk [does not] establish that the Government was deliberately indifferent" to Petitioner's serious medical needs. See Hope, 972 F.3d at 330. While COVID-19 certainly presents a serious medical issue, as noted supra, YCP "has taken significant steps to curb the introduction or spread of COVID-19 and to contain and treat those who may become infected with the virus." See Evdokimow, 2021 WL 767554, at *8. Again, as of May 19, 2021, only 35 detainees were infected with COVID-19. Moreover, YCP medical staff have begun to offer the Johnson and Johnson COVID-19 vaccine to detainees. The Court cannot conclude from the record before it that YCP has been deliberately indifferent to Petitioner's medical needs. On the contrary, YCP has "quickly and effectively implemented the guidelines published by the CDC such that [it has] stymied any potential outbreak within [its] walls . . . and [any COVID-19 outbreak at YCP] appears to have been effectively contained." See Thakker, 456 F. Supp. 3d at 660. "There is no perfect solution to preventing the spread of COVID-19 in detention facilities, but [YCP] officials have taken reasonable steps to limit the

13

spread throughout its facility." Verma, 2020 WL 1814149, at *6. Petitioner, therefore, cannot establish a "conscious disregard for the risk posed by COVID-19." See id.

Moreover, there is no evidence before the Court that Petitioner's medical condition is such that "a failure to treat can be expected to lead to substantial and unnecessary suffering, injury, or death." See Woloszyn, 396 F.3d at 320. Petitioner is age 55 or older and has been diagnosed with hypertension, high blood pressure, diabetes, and diverticulitis. (Doc. No. 12-1 at 19.) As noted supra, when conducting Petitioner's custody review, ICE noted that these conditions increased Petitioner's risk should he contract COVID-19. However, nothing in the record before the Court suggests that staff at YCP would not provide treatment should Petitioner contract COVID-19. Petitioner simply has not shown that YCP has been deliberately indifferent to any serious risk to Petitioner's medical needs. Accordingly, his claim for deliberate indifference will also be denied.

## IV. CONCLUSION

For the foregoing reasons, the Court will deny Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 (Doc. No. 1) and his motion to compel (Doc. No. 4). An appropriate Order follows.